IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ANTHONY JEROME HAIRSTON,

    Petitioner,                   2: 10 - cv - 3056 - JAM TJB

    vs.

K. HARRINGTON,

    Respondent.               ORDER, FINDINGS AND

                                       RECOMMENDATIONS

_____/

    Petitioner, Anthony Jerome Hairston, is a state prisoner proceeding, *pro se*, with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is currently serving a determinate sentence of 13 years in prison after being convicted on three misdemeanor counts of resisting or evading arrest (Cal. Penal Code § 148(a)(1)) and one felony count of making a criminal threat (*Id.* § 422).[1] A sentencing enhancement for the personal use of a firearm was also found to be true (*Id.* § 12022.5(a)). Petitioner raises five claims in this federal habeas petition; specifically: (1) the evidence adduced at trial was insufficient to support a conviction for making

---

[1] A jury convicted Petitioner of three counts of resisting arrest, but deadlocked on the criminal threat count. On retrial, a second jury found Petitioner guilty of making a criminal threat as well as the associated sentencing enhancement for use of a firearm.

1

a criminal threat ("Claim I"); (2) the trial court erred in failing, *sua sponte*, to instruct the jury on the lesser included offense of attempted criminal threat ("Claim II"); (3) the conviction on three counts of evading arrest from the same incident violated Petitioner's rights under the Fourteenth Amendment ("Claim III"); (4) the trial court erred by not staying the imposition of sentence on the second and third evading arrest convictions ("Claim IV"); and, (5) the trial court erred in sentencing Petitioner to the upper term for both the use of a firearm enhancement and criminal threat charge based on aggravating factors not proved to the jury beyond a reasonable doubt ("Claim V"). For the reasons stated herein, the federal habeas petition should be denied.

## I. FACTUAL BACKGROUND[2]

> Braulio Meraz lived in an Oak Park apartment complex with his wife and four children. On February 20, 2007, Meraz was outside in the complex's parking lot talking with a friend who was working on a car. Patrice Watson was also there.
>
> A maroon, four-door sedan pulled into the parking lot, with rap music blaring from inside. Three people exited the car. Defendant, the car's driver, was rapping and singing.FN3 Meraz told his friend that defendant's singing sounded like a song Elmo from Sesame Street had rapped.
>
>> FN3. Meraz and Watson both identified defendant at trial as the driver of the car.
>
> Defendant heard Meraz's remark. He asked Meraz if he was trying to be funny. Surprised, Meraz stood back and went about his business. He also replied angrily and called defendant "boy." Watson testified that defendant told Meraz to watch his "M F" mouth, and then words went back and forth.
>
> Defendant and his companions walked up a flight of stairs and into an apartment. Watson stated that before defendant went inside, he broke the window of one of the apartments. Meraz did not see that act or hear any glass breaking.
>
> A man nicknamed "Pumpkin" came out of the upstairs apartment and asked Meraz if the three men had been "tripping" with him.

---

[2] The factual background is taken from the California Court of Appeal, Third Appellate District decision on direct appeal from May 2009 and filed in this Court by Respondent on August 4, 2011 as Lodged Doc. No. 9 (hereinafter referred to as the "Slip Op."). *See also People v. Hairston*, 174 Cal.App.4th 231, 94 Cal.Rptr.3d 159 (2009).

Pumpkin said he would handle it. Meraz, thinking the incident amounted to nothing, did not respond, and he went back to talking with his friends.

Eventually, defendant and his two companions came out from the apartment. Watson testified that defendant stood at the railing, telling Meraz he did not know who he was messing with. Defendant said he ran Oak Park. As defendant walked down the stairs, he told Meraz, "I've got something for you." Defendant and Meraz renewed their verbal confrontation. Meraz told defendant he was not scared. At the bottom of the stairs, defendant told Watson to tell Meraz he had better respect him.

Meraz testified that he did not hear, or could not recall, any of these statements by defendant. He claimed he did not exchange any words with defendant while defendant was coming down the stairs. He did, however, watch defendant come down the stairs, and he gave defendant "hard looks" while he walked back to his car. His fists may even have been clenched. Meraz was prepared to fight.

Defendant and his companions got back into their car. Meraz walked up to the car in an aggressive manner. When he put his hands on the passenger door and looked in, he saw defendant seated in the driver's seat holding a handgun up to his chest. The gun was pointed away from Meraz. Defendant repeatedly asked Meraz, "[I]s there a problem, bitch? Is there a problem bitch? Is there a fucking problem, bitch?" Defendant put his left hand down to the side, pulled out another gun, and handed it to his front-seat passenger. The passenger in the backseat leaned forward and also displayed a gun.

Meraz suddenly felt his life was in danger. He threw up his hands, backed away from the car, and told defendant he did not want any trouble "like that." Meraz backed away as far has he could to a fence. As defendant backed the car up to leave, he and his passengers continued calling Meraz a "bitch" and asking if there was "a fucking problem." Meraz believed they were doing anything they could to get him to respond. Afraid of being shot, Meraz said nothing. He "sort of blacked out to what they were saying" at that time. However, as the car drove away, Meraz heard someone from inside the car say, "[Y]ou better not be here when we get back."

Watson testified she saw defendant point his gun at Meraz as he started to back the car out. At that point, Watson moved away from Meraz. One of the passengers in the car said to her, "[Y]eah, mom, go in the house." Believing the three men "were about to light [Meraz] up," Watson went into her apartment. She told her daughter and niece to take her grandchild into the room and lie down on the floor.

3

Meraz was able to remember the car's license plate. He ran to his apartment and called 9–1–1. He feared for his life and that of his family, and he believed the men would return to harm them. He told the operator the three men were going to come back because that was what they had said, and he wanted the police to get to the complex quickly in case the men returned.

Approximately 15 minutes after receiving the dispatch based on Meraz's call, Sacramento County Sheriff's Deputy Donny Vettel noticed he was driving behind defendant's car. Defendant pulled into an apartment complex and parked the car. Deputy Vettel activated his lights. Defendant and the rear-seat passenger got out of the car and ran. The deputy yelled at the men to stop, but they ran around a building and out of sight. Deputy Vettel did not pursue them. No one remained in defendant's car.

As Sheriff's Deputy Robert Patton drove past the apartment complex, he saw defendant and another person running through the complex and jumping over a wall surrounding a garbage dumpster. Deputy Patton exited his car, identified himself, and ordered the two men to put their hands over their heads. Defendant and his companion looked at the deputy, jumped back over the wall, and ran through the complex. Deputy Patton ran after them, but when the two men ran in separate directions, the deputy stopped his pursuit.

Sheriff's Deputy Robert White arrived at the complex to assist Deputy Vettel. As Deputy White was driving around the complex, defendant ran towards Deputy White's car. Defendant's right hand was in his pants. Deputy White slammed on his brakes, got out of his car, pointed his gun at defendant, and commanded defendant to stop. Defendant turned, ran away through a parking lot, and ran behind a concrete retaining wall and out of the deputy's sight.

Seconds later, defendant ran around the retaining wall and jumped over a fence into a park. Both of defendant's hands were now visible. Deputy White jumped onto the fence, pointed his gun at defendant, and told him to lie down and give up. Defendant did.

Deputy White searched the area. Behind the retaining wall, he found a black wool jacket and a sock containing a .38–caliber handgun. There were five expended shell casings in the gun but no live ammunition.

## II. APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws of the United States. *See* 28 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

*Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in the state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d); *Perry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000).

In applying AEDPA's standards, the federal court must "identify the state court decision that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). "The relevant state court determination for purposes of AEDPA review is the last reasoned state court decision." *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). To the extent no such reasoned opinion exists, courts must conduct an independent review of the record to determine whether the state court clearly erred in its application of controlling federal law, and whether the state court's decision was objectively unreasonable. *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). "When it is clear, however, that the state court has not decided an issue, we review that question *de novo*." *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*, 545 U.S. 374, 377 (2005)).

5

## III. ANALYSIS OF PETITIONER'S CLAIMS

1. Claim I

In Claim I, Petitioner challenges the sufficiency of the evidence with regard to his conviction for making a criminal threat. In ruling on this claim, the California Court of Appeal stated as follows:

> Defendant contends insufficient evidence supports his criminal threat conviction. He claims the evidence does not establish that his statements conveyed the immediate prospect of execution of a threat, or that they caused Meraz to be in sustained fear for his safety. We disagree.
>
> "[T]he crime of criminal threat is set forth in section 422. That statute provides in relevant part: 'Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety' is guilty of a crime, which is punishable alternatively as a misdemeanor or a felony." (*People v. Toledo* (2001) 26 Cal.4th 221, 227 (*Toledo*), fn. omitted.)
>
> Section 422 contains "five constituent elements that must be established to find that a defendant has committed this offense. In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat -- which may be 'made verbally, in writing, or by means of an electronic communication device' -- was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. (See generally *People v. Bolin* (1998) 18 Cal.4th

297, 337-340 & fn. 13 [(*Bolin*)].)" (*Toledo*, *supra*, 26 Cal.4th at pp. 227-228.)

Defendant claims the evidence does not support the verdict on the third element, that his statements conveyed the immediate prospect of execution of a threat, and the fourth element, that his statements caused Meraz to be in sustained fear for his safety.

We deal with the fourth element first. Substantial evidence supports the finding that defendant's statements placed Meraz in sustained fear for his and his family's safety. Meraz testified he was so scared he backed away into a corner, and felt as if he blacked out as to what defendant was saying. Upon defendant's departure, Meraz immediately called 9-1-1 and asked that the police hurry because he feared defendant would return. This testimony sufficiently demonstrated that Meraz was in a state of sustained fear for his safety.

We turn now to the third element. To satisfy this element, the evidence must show the threat was "'on its face and under the circumstances in which it [was] made, . . . *so* unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat . . . .'" (*Bolin*, *supra*, 18 Cal.4th at p. 337, italics added.)

"'The use of the word "so" indicates that unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey a gravity of purpose and immediate prospect of execution to the victim.' [Citation.]" (*Bolin*, *supra*, 18 Cal.4th at p. 340.)

"The four qualities are simply the factors to be considered in determining whether a threat, considered together with its surrounding circumstances, conveys those impressions to the victim." (*People v. Stanfield* (1995) 32 Cal.App.4th 1152, 1157–1158-1159.)

These factors may also be found in a threat which, on first blush, appears ambiguous or conditional. "A communication thatis ambiguous on its face may nonetheless be found to be a criminal threat if the surrounding circumstances clarify thecommunication's meaning. [Citation.]" (*In re George T.* (2004) 33 Cal.4th 620, 634.)

"Several appellate decisions have held, in the context of determining whether conditional, vague, or ambiguous language could be the predicate for a conviction of making terrorist [or criminal] threats, that all of the surrounding circumstances should be taken into account to determine if a threat falls within the

7

proscription of section 422. This includes the defendant's mannerisms, affect, and actions involved in making the threat as well as subsequent actions taken by the defendant. The courts have taken this approach in order to further the legislative intent behind the statute. 'In enacting section 422 . . . , the Legislature declared that every person has the right to be protected from fear and intimidation. This act was in response to the growing number and severity of threats against peaceful citizens.' (*People v. Martinez* (1997) 53 Cal.App.4th 1212, 1221.)

"For instance, in *People v. Martinez*, *supra*, 53 Cal.App.4th 1212, the defendant claimed the language of his threat was vague and did not specifically convey a threat of great bodily injury or death. The appellate court conceded his threat may not have, by itself, conveyed a threat to commit great bodily injury or death but held that the trier of fact could consider all of the surrounding circumstances in deciding whether a terrorist threat had been made. In that case, the defendant set fire to a building where the victim worked a day after the defendant had made the threat. The court held the jury could properly consider that fact. It reasoned: 'Defendant's activities after the threat give meaning to the words and imply that he meant serious business when he made the threat.' (*Id.* at p. 1221, fn. omitted.)" (*People v. Solis* (2001) 9 Cal.App.4th 1002, 1013.)

Here, Meraz was not threatened or in a state of fear until he walked up to the car and looked inside the passenger window. Even then, defendant's statements are ambiguous. He continually kept asking Meraz, "Is there a problem, bitch?" Is there a fucking problem, bitch?" These statements facially do not express a direct threat. However, when considered in context --that as Meraz heard these statements he suddenly faced three separate handguns, and he was told he had better not be there when the three men returned -- the threat becomes clear. If Meraz does not leave the apartment complex, he will be hurt.

This threat, when viewed in the surrounding circumstances, was sufficiently unequivocal, unconditional, immediate and specific to convey a gravity of purpose and immediate prospect of execution to Meraz. A juror could have reasonably determined from this evidence that defendant intended to threaten Meraz with physical harm, and that the threat was serious enough to lead Meraz to believe he was in immediate fear for his safety. Substantial evidence supports the criminal threat conviction.

Slip Op. at 9-14.

/ / /

/ / /

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[T]he dispositive question under *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318). A petitioner for writ of habeas corpus "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).

A federal habeas court determines the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. *See Jackson*, 443 U.S. at 324 n. 16; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." (citations omitted)). Petitioner was convicted of violating California Penal Code section 422. That section states, as relevant:

> Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety is guilty of a crime. . . .

*See People v. Toledo*, 26 Cal.4th 221, 227 (2001).

///

Thus, to be found guilty of this crime, the prosecution must prove five distinct elements: (1) the defendant willfully threatened to commit a crime which will result in death or great bodily injury to another person; (2) the defendant made the threat with the specific intent that the statement is to be taken as a threat, even if the defendant has no intent of actually carrying it out; (3) that the threat–which may be made verbally, in writing, or by electronic communication device–was on its face and under the circumstances in which it was made so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and immediate prospect of execution of the threat; (4) the threat actually caused the person threatened to be in sustained fear for his or her own safety or for his or her immediate family's safety; and, (5) that the threatened person's fear was reasonable under the circumstances. *See id.* at 227-28. Petitioner challenges the sufficiency of the evidence as to the third and fourth elements of the offense.

As to the fourth element of the offense, viewing the evidence in the light most favorable to the prosecution, there is ample evidence that the victim in this case was in sustained fear for his life. The victim, Braulio Meraz, testified that after Petitioner and his friends returned to their car, he approached them. As he approached the vehicle, he could see that Petitioner was brandishing a handgun. Rep.'s Tr. at 996. Petitioner, weapon in hand, repeatedly asked Meraz "is there a problem," "is there a fucking problem," and "is there a problem bitch?" *Id.* at 996-98. Meraz felt his life was in danger. *Id.* at 998. He thought Petitioner might shoot him, and did not respond to Petitioner and his cohorts' provocations for fear he would be shot if he responded. *Id.* at 998-99. As Petitioner began to drive away, Meraz heard them say "you better not be here when we get back." *Id.* at 1000. Meraz believed they did intend to return and find him, and, concerned about his and his family's safety, ran upstairs and called 9-1-1. *Id.* at 1000-03.

Meraz's testimony provides ample evidence that the threat actually caused the person threatened to be in sustained fear for his or her own safety or for his or her immediate family's safety. It is clear that when Meraz saw the gun, combined with Petitioner's provocative

statements, he feared for his life. That Meraz immediately called police after the incident verifies his testimony that he feared for his and his family's lives. Viewing the evidence in the light most favorable to the prosecution, the Court of Appeal reasonably concluded substantial evidence exists from which a jury could find the fourth element of the crime of criminal threat beyond a reasonable doubt.

As to the third element of the offense—that the threat was on its face and under the circumstances in which it was made so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and immediate prospect of execution of the threat—the California courts have interpreted the unequivocal, unconditional, immediate, and specific nature of the threat as merely factors to consider, along with the surrounding circumstances of the statement, in determining whether the statement conveyed a gravity of purpose and immediate prospect of execution. *See People v. Bolin,* 18 Cal.4th 297 (1998); *People v. Stanfield*, 32 Cal.App.4th 1152, 1157-59 (1995); *In re George T.*, 33 Cal.4th 620, 634 (2004); *People v. Martinez,* 53 Cal.App.4th 1212, 1221 (1997). "Unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey a gravity of purpose and immediate prospect of execution to the victim." *Bolin*, 18 Cal.4th at 340. This interpretation of the statute is binding upon this court. *Richey*, 546 U.S. at 76.

In the present case, while Petitioner's statements taken out of context do not convey a criminal threat, viewed in conjunction with the surrounding circumstances the words conveyed a gravity of purpose and immediate prospect of execution. As Petitioner repeatedly asked Meraz whether there was a problem, he was displaying a gun. The jury could have reasonably concluded from the act of displaying the gun, combined with the repeated questioning, that, if there was a problem, Petitioner may have shot Meraz. A statement that may be ambiguous or unequivocal under normal circumstances, can quickly turn into a criminal threat when introduced in conjunction with the display of a handgun. The Court of Appeal reasonably concluded that

there is substantial evidence that Petitioner's statements, combined with the surrounding circumstances, conveyed a gravity of purpose and immediate prospect of execution, and Petitioner is not entitled to relief on this claim.

    2. Claim II

Next, Petitioner finds error in the trial court's failure to *sua sponte* instruct the jury on the lesser included offense of attempted criminal threat. In *Beck v. Alabama*, 447 U.S. 625, 638 (1980), the Supreme Court of the United States held that a defendant in a capital murder case has a constitutional right to have the jury instructed on a lesser included offense in certain instances. In a footnote, the Court expressly reserved judgment on "whether the Due Process Clause would require the giving of such instructions in a non-capital case." *Id.* at 638 n. 7. The Supreme Court has not addressed that question since and, as such, Petitioner cannot establish that the failure to instruct the jury on the lesser included offense in this case violated clearly established federal law, as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d)(1); *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984) ("the failure of a state court to instruct on a lesser offense [in a non-capital case] fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding." (citations omitted) (alteration in original)); *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Turner v. Marshall*, 63 F.3d 807, 819 (9th Cir. 1998). Petitioner is not entitled to relief on this claim.

    3. Claim III

In Claim III, Petitioner finds error in his conviction on three counts of evading arrest stemming from one continuous attempt to evade the police. The factual predicate for this claim is accurately set forth in the California Court of Appeal's decision and set forth in section I, *supra*. One officer attempted a traffic stop on Petitioner, but Petitioner fled on foot. Thereafter, another officer encountered Petitioner, identified himself as a police officer, and told Petitioner to stop. Petitioner jumped over a wall and continued to flee. Finally, a third officer saw Petitioner running towards his police vehicle. He ordered Petitioner to stop, but Petitioner ran

around a wall out of sight.  Eventually, the third officer made contact with Petitioner again, and he finally ended his attempt to flee, as it turns out, after he had attempted to hide a gun he had been carrying behind the wall.  Petitioner was convicted on one count of evading arrest for each time he refused to stop when commanded by a police officer.  He claims that this is so fundamentally unfair as to constitute a denial of Due Process as guaranteed by the Fourteenth Amendment.

"Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Dowling v. United States*, 493 U.S. 342, 352 (1990).  The Supreme Court has, therefore, "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Id.*  California has determined that a person may be charged with evading arrest for each occasion he evades a police officer, even if it occurs multiple times within the same continuous attempt to flee from apprehension. *Hairston*, 174 Cal.App.4th at 238-39 ("A defendant can be convicted under section 148 for each peace officer he obstructs, even if he engages in only one act of obstruction.").  This interpretation of California law is binding upon this court, *Richey*, 546 U.S. at 76, and presents no potential constitutional violation, much less a violation of clearly established federal law.  As such, Petitioner is not entitled to relief on this claim.

    4. Claim IV

Petitioner next claims the trial court erred by not staying the imposition of sentence on the second and third evading arrest convictions pursuant to California Penal Code section 654, instead running the one year sentences on each conviction concurrently to his thirteen year sentence on the criminal threat charge and the sentencing enhancement for personal use of a firearm. Petitioner fails to state a claim which could potentially entitle him to relief.  His claim challenges the state court's interpretation and application of the California penal code, but claims no violation of federal law. *See* 28 U.S.C. § 2254(a).  Moreover, the determination as to how a sentence is to be served, whether stayed, served concurrently, or served consecutively, "has long

13

been considered the prerogative of state legislatures" and does not present a constitutional violation. *Oregon v. Ice*, 555 U.S. 160, 168-69 (2009) (In light of the historical prerogative of the trial court to determine how a sentence is to be imposed, "legislative reforms regarding the imposition of multiple sentences do not implicate the core concerns that prompted our decision in *Apprendi*."). No relief is available to Petitioner on this claim.

5. Claim V

In his final claim, Petitioner claims the trial court erred by sentencing him to the upper term for both the use of a firearm enhancement and criminal threat charge based on aggravating factors not proved to the jury beyond a reasonable doubt. In upholding the upper term sentence, the Court of Appeal concluded that Petitioner was eligible for the upper term based on his juvenile record, which they concluded did not need to be presented to the jury under the prior offense exception to *Cunningham v. California*, 549 U.S. 270 (2007). *See* Slip Op. at 26-31.

The Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant. *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); *Blakely v. Washington*, 542 U.S. 296 (2004); *United States v. Booker*, 543 U.S. 220 (2005). In *Cunningham*, *supra*, the Supreme Court had the opportunity to apply its previous rulings to California's determinate sentencing law. Under California's determinate sentencing law, the statute defining most offenses, including Petitioner's, "prescribes three precise terms of imprisonment—a lower, middle, and upper term sentence." *Cunningham*, 549 U.S. at 277; *see People v. Black*, 35 Cal.4th 1238, 1247, 29 Cal. Rptr. 3d 740, 113 P.3d 534 (2005) ("*Black I*"), *overruled by Cunningham* (outlining California's determinate sentencing law). California Penal Code section 1170, subsection (b) governs the trial court's choice; it provides that "the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime." Therefore, the maximum sentence which a defendant may receive based solely on the facts reflected in the jury verdict is

14

the middle term—the statutory maximum for purposes of the Sixth Amendment. *Cunningham*, 549 U.S. at 289; *Blakely*, 542 U.S. at 303 ("[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." (emphasis in original)).

In California, in order for a trial court to sentence a defendant to the upper term, the court need only find one aggravating factor. *See People v. Black*, 41 Cal. 4th 799, 805, 62 Cal. Rptr. 3d 569, 161 P.3d 1130 (2007) ("*Black II*"); *Butler v. Curry*, 528 F.3d 624, 642 (9th Cir. 2008) (accepting the California Supreme Court's decision in *Black II* as a valid interpretation of California law). Thus, "if at least one of the aggravating factors on which the judge relied upon in sentencing a defendant was established in a manner consistent with the Sixth Amendment, the defendant's sentence does not violate the Constitution." *Butler*, 528 F.3d at 643. Once imposition of the upper term is available because of either a prior conviction or an aggravating factor proved beyond a reasonable doubt to a jury, any additional aggravating factors determined by the judge are within his discretion in determining which sentence to impose. *Id.*

In the present case, with regard to the upper term on the criminal threat conviction, the trial judge relied upon Petitioner's juvenile record in sentencing him to the upper term. Petitioner's juvenile record was not proved to the jury, therefore the issue is whether reliance on a defendant's juvenile adjudication in sentencing him to the upper term falls within the prior conviction exception. The Supreme Court is yet to definitively define the contours of the prior conviction exception. For example, the circuit courts have disagreed as to whether a defendant's probationary status qualifies him for the upper term without proving that fact beyond a reasonable doubt to the jury. Several circuits have read the exception broadly. *See, e.g.*, *United States v. Corchado*, 427 F.3d 815, 820 (10th Cir. 2005) ("[T]he 'prior conviction' exception extends to 'subsidiary findings' such as whether a defendant was under court supervision when he or she committed a subsequent crime."); *United States v. Williams*, 410 F.3d 397, 399, 402 (7th Cir. 2005); *United States v. Fagans*, 406 F.3d 138, 141-42 (2d Cir. 2005); *see also Butler v.*

15

*Curry*, 528 F.3d 624, 647 (9th Cir. 2008) (discussing the approach of other circuit courts). The Ninth Circuit, on the other hand, has interpreted the exception narrowly. *See Butler*, 528 F.3d at 644 ("[W]e have been hesitant to broaden the scope of the prior conviction exception . . . ."); *United States v. Kortgaard*, 425 F.3d 602, 610 (9th Cir. 2005) (declining to "extend or broadly construe" the prior conviction exception); *United States v. Tighe*, 266 F.3d 1187, 1194 (9th Cir. 2001) (holding that the prior conviction exception "should remain a 'narrow exception' to *Apprendi*" (citing *Apprendi*, 530 U.S. at 490)). State courts have also offered varying interpretations of the exception. For instance, the California Supreme Court has opined that the exception is not to be read "too narrowly." *Black II*, 41 Cal. 4th at 819. Other state courts have reached similar conclusions. *See,e.g.*, *State v. Jones*, 159 Wash.2d 231, 149 P.3d 636, 640-41 (2006); *State v. Fagan*, 280 Conn. 69, 905 A.2d 1101, 1121 (2006); *Ryle v. State*, 842 N.E.2d 320, 323-25 (Ind. 2005); *State v. Allen*, 706 N.W.2d 40, 48 (Minn. 2005).

Dealing specifically with juvenile adjudications, the California Supreme Court has held that a prior juvenile adjudication can support the imposition of the upper term under the prior conviction exception. *People v. Nguyen*, 46 Cal.4th 1007, 209 P.3d 946 (2009) (*Nguyen* was before the California Supreme Court when the Court of Appeal issued its decision in Petitioner's case). Other state courts have reached similar conclusions. *See, e.g.*, *People v. Mazzoni*, 165 P.3d 719, 722-23 (Colo. Ct. App. 2007); *State v. McFee*, 721 N.W.2d 607, 615-19 (Minn. 2006); *State v. Weber*, 159 Wash.2d 252, 149 P.3d 646, 649-53 (2006); *Nichols v. State*, 910 So.2d 863, 864-65 (Fla. Dist. Ct. App. 2005); *Ryle v. State*, 842 N.E.2d 320, 321-23 (Ind. 2005); *State v. Hitt*, 273 Kan. 224, 42 P.3d 732, 740 (2002); *but see State v. Brown*, 879 So.2d 1276, 1281-90 (La. 2004). Likewise, several federal circuits have concluded that a juvenile adjudication is within the prior conviction exception. *United States v. Matthews*, 498 F.3d 25, 34-36 (1st Cir. 2007); *United States v. Crowell*, 493 F.3d 744, 749-51 (6th Cir. 2007); *United States v. Burge*, 407 F.3d 1183, 1187-91 (11th Cir. 2005); *United States v. Jones*, 332 F.3d 688, 694-96,(3d Cir. 2003); United *States v. Smalley*, 294 F.3d 1030, 1031-33 (8th Cir. 2002). The Ninth Circuit,

which has read the exception narrowly, has concluded, to the contrary, that a juvenile adjudication does not fall within the prior conviction exception because juveniles are not guaranteed the right to a trial by jury. *Tighe*, 266 F.3d at 1191-95; *see McKeiver v. Pennsylvania*, 403 U.S. 528 (1971) (the Constitution does not afford the right to a jury trial in juvenile proceedings) .

Under AEDPA, the writ of habeas corpus can only be granted if the state court unreasonably applied clearly established federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). Given the varying interpretations of the prior conviction exception, both in general and specifically on the issue of juvenile adjudications, the state court's determination that Petitioner's juvenile record made him eligible for the upper term on the criminal threats conviction is a reasonable interpretation of federal law based on the Supreme Court's applicable decisions. *See Kessee v. Mendoza-Powers*, 574 F.3d 675, 678 (9th Cir. 2009) ("[A]lthough a defendant's probationary status does not fall within the 'prior conviction' exception, a state court's interpretation to the contrary does not contravene AEDPA standards.").

With regard to the upper term sentence on the sentencing enhancement, a review of the record shows that it is unclear what factors the trial court relied upon in sentencing Petitioner to the upper term. Like the Court of Appeal, this court, for sake of argument, assumes the trial court did not specify its reasons for imposing the upper term on the enhancement. *See* Slip Op. at 26. Sentencing errors, such as the one Petitioner claims, are not structural and are subject to harmless error analysis. *See Washington v. Recuenco*, 548 U.S. 212, 221 (2006); *Butler v. Curry*, 528 F.3d 624, 648 (9th Cir. 2008) (applying harmless error to *Cunningham* claim); *Castillo v. Clark*, 610 F.Supp.2d 1084, 1124-26 (C.D. Cal. 2009) (discussing harmless error analysis in context of a *Cunningham* claim). When a petitioner seeks collateral relief from a state court judgment, a federal court employs a less stringent harmless error analysis than that applied on direct review, whether the "error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v.*

17

*United States*, 328 U.S. 750, 776 (1946)); *see Fry v. Pliler*, 551 U.S. 112 (2007) (holding that "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* . . . whether or not the state appellate court recognized the error and reviewed it for harmlessness under . . . *Chapman*").

In the present case, considering the trial court relied on Petitioner's juvenile record in sentencing him to the upper term on the underlying felony, as discussed above, there is no difficulty in concluding that any error was harmless as to the upper term sentence on the sentencing enhancement. The trial court could also have relied on Petitioner's juvenile record in sentencing him to the upper term on the enhancement. Petitioner is not entitled to relief on this, his final, claim.

## IV.  REQUEST FOR AN EVIDENTIARY HEARING

Finally, Petitioner requests an evidentiary hearing on his Claims. *See, e.g.*, Response, at 2-3. A court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate." *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999); *see also Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005). A petitioner requesting an evidentiary hearing must also demonstrate that he has presented a "colorable claim for relief." *Earp*, 431 F.3d at 1167 (citations omitted). To show that a claim is "colorable," a petitioner is "required to allege specific facts which, if true, would entitle him to relief." *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation omitted). In this case, Petitioner's claims are readily determined by the record. Petitioner has not alleged any additional facts that, if true, would entitle him to relief and, therefore, Petitioner fails to demonstrate that he has a colorable claim for federal habeas relief. Moreover, the Supreme Court has recently held that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits" and "that evidence introduced in federal

court has no bearing on" such review. *Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388, 1398, 1400 (2011).  Thus, his request will be denied.

## V.  CONCLUSION

Accordingly, IT IS HEREBY ORDERED that Petitioner's request for an evidentiary hearing is DENIED.

For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: January 18, 2012

TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE